T.C. Memo. 2021-65

UNITED STATES TAX COURT

ESTATE OF SEMONE GROSSMAN, DECEASED, RICHARD M. FROME, PRELIMINARY EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9892-18.                    Filed May 27, 2021.

Decedent H and W1, who were both Jewish, married in N.Y. in 1955. They separated in 1965, and H attempted to end the marriage by obtaining a unilateral divorce in Mexico. In 1967, H participated in a civil marriage ceremony with W2, who was not Jewish, in N.J.

By 1974, H's relationship with W2 had ended. In that year, W1 sued H and W2 in N.Y., seeking a declaratory judgment that the Mexican divorce was null and void and that she (W1) was still H's lawful wife. W1 prevailed in the suit, but did not reconcile or cohabit with H thereafter.

By 1986, H became engaged to W3. H and W3, who was also Jewish, decided to get married in the State of Israel. Before the wedding, H and W1 appeared before an orthodox rabbinical court in N.Y. to obtain a Jewish religious divorce. H and W3 presented evidence of the divorce to the Israeli authorities and were married in Israel in 1987.

**Served 05/27/21**

[*2]    After their marriage in Israel, H and W3 returned to N.Y. and lived there as husband and wife for 27 years, until H's death in 2014. They had two children, filed joint Federal income tax returns, and shared a home and finances. During this time, W1 also lived in N.Y., saw H and W3 socially, and never challenged their marriage. W1 filed Federal income tax returns as single and made no statutory claim against H's estate after his death.

When H died in 2014, he left the bulk of his estate to W3, and the estate claimed a corresponding marital deduction under I.R.C. sec. 2056(a). R denied the deduction and argues in a motion for partial summary judgment that H's religious divorce from W1 was invalid under N.Y. law. Relying on N.Y. law, R argues that W1, rather than W3, was H's surviving spouse when he died.

H's estate disagrees. In its competing motion for partial summary judgment, the estate maintains that N.Y. law is irrelevant to the dispute and that certain IRS revenue rulings and Federal caselaw require the Court to look only to Israeli law to determine W3's status as surviving spouse. The estate further contends that, even if we accept R's premise that N.Y. law provides the rule of decision, the estate prevails because N.Y. courts would respect H's marriage to W3 under their longstanding place of celebration test.

Held: For purposes of deciding the motions, we can assume (as R contends) that N.Y. law applies to determine W3's marital status at the time of H's death;

Held, further, W3's Israeli marriage to H was valid under the place of celebration test that the N.Y. Court of Appeals has applied consistently for 140 years;

Held, further, W3 is H's surviving spouse within the meaning of I.R.C. sec. 2056(a).

**[\*3]**  <u>Megan E. Wernke</u>, <u>Christopher S. Rizek</u>, and <u>Beth Shapiro Kaufman</u>, for petitioner.

<u>Shawna A. Early</u>, <u>Michael J. De Matos</u>, and <u>Marc L. Caine</u>, for respondent.

MEMORANDUM OPINION

TORO, <u>Judge</u>:  Before the Court are competing motions for partial summary judgment.  They present the question of whether Ziona Grossman is the "surviving spouse" of decedent Semone Grossman for purposes of the estate tax marital deduction provided by section 2056(a).[1]  Semone and Ziona, both Jewish and residents of New York, celebrated their marriage in the State of Israel in 1987 pursuant to that country's laws after Semone obtained a religious divorce from his first wife Hilda, who was also Jewish and a New York resident.  After celebrating their marriage, Semone and Ziona returned to New York, had two daughters, and lived together as husband and wife for 27 years until Semone's death in 2014, all without challenge from Hilda, who was familiar with the New York rules for

---

[1]Unless otherwise noted, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*4] challenging an invalid marriage. Hilda, in turn, reported in her tax returns that she was single and, after Semone's death, made no statutory claim for an elective share as a surviving spouse against Semone's considerable estate.

Although the parties most directly interested in the status of Semone and Ziona's marriage appear to have been satisfied with the validity of that marriage, and although no New York court has cast any doubts on that score, in his motion for partial summary judgment the Commissioner of Internal Revenue asks us to hold that Semone and Ziona's Israeli marriage was a nullity and that, for Federal estate tax purposes, Hilda, not Ziona, was Semone's "surviving spouse." For the reasons set out below, we decline the Commissioner's invitation.

In its competing motion for partial summary judgment, the Estate of Semone Grossman (the "Estate") contends that, based on the record before us, Ziona is Semone's surviving spouse under section 2056(a). As we explain below, we agree with the Estate.

## Background

The following facts are derived from the pleadings, the parties' motion papers, and the declarations and exhibits attached thereto. These facts are stated solely for the purpose of ruling on the motions and not as findings of fact in this case. See Ramey v. Commissioner, 156 T.C. ___, ___ (slip op. at 6) (Jan. 14,

[*5] 2021).  The Preliminary Executor of the Estate, Richard M. Frome, resided in New York when the petition was filed.

A.    Personal History

Semone Grossman was born in Germany in 1930 and spent most of his childhood in Poland.  He and his family were Jewish, and many of his family members, including his parents, perished in the Holocaust.  Semone was interned in a series of concentration camps during the war, but ultimately survived and emigrated to the United States in or around 1949.  He settled in New York City and got into the business of owning and operating parking garages.

Semone's first wife, Hilda Matrick Grossman, was also Jewish.  Semone and Hilda were married in New York City in 1955 and subsequently had two children together.

Semone and Hilda ceased living together in the mid-1960s.  In 1965, they entered into a separation agreement that set out their respective property rights and required Semone to make regular payments to Hilda.  From that point on, Semone and Hilda never reconciled or cohabited.

By 1967, Semone had commenced a new relationship with Katia Equale, who was not Jewish.  Semone traveled to Mexico to obtain a divorce from Hilda and, although Hilda did not appear or otherwise participate in the proceeding, the

[*6] divorce was granted by the Second Civil Court of the Bravos District, State of Chihuahua, Republic of Mexico, on or about August 24, 1967. After Semone obtained the divorce, Semone and Katia participated in a civil marriage ceremony in New Jersey and subsequently had two children.

By 1974, Semone and Katia's relationship had ended. In that year, Hilda filed suit in the Supreme Court of the State of New York against Semone and Katia seeking a declaratory judgment that the Mexican divorce was null and void and that she (Hilda) remained Semone's lawful wife. After a trial held in 1976, the court ultimately found in Hilda's favor and decided the following:

> 1. The marriage between defendant Simon Grossman[2] and plaintiff Hilda Matrick Grossman was not legally dissolved by a Court of competent jurisdiction.
>
> 2. The purported marriage between the defendant Simon Grossman and defendant Katia Grossman which took place on or about September 20, 1967, is null and void.
>
> 3. The defendant Simon Grossman is the lawful husband of the plaintiff Hilda Matrick Grossman.

As already noted, Semone and Hilda did not cohabit after the court issued its decision.

---

[2]Various documents in the record spell Semone's name as "Simon."

[*7]   By 1986, Semone was engaged to Ziona.  Ziona was born and raised in Israel and by 1986 had become a dual United States-Israeli citizen and a resident of New York.  Her parents, siblings, and other family members and friends still lived in Israel at the time of Semone and Ziona's engagement, and Ziona traveled between the United States and Israel several times per year to visit.  Semone also had family and friends in Israel, and Semone and Ziona decided to get married there.

Before his marriage to Ziona, Semone asked Hilda to cooperate with him in the giving of a *get*, which is a religious divorce under rabbinical law.  See Linda S. Kahan, "Jewish Divorce and Secular Courts:  The Promise of Avitzur," 73 Geo. L. J. 193, 194 (1984).  On November 12, 1986, Semone and Hilda appeared before an orthodox rabbinical court (*Beth Din*)[3] of the Lisker Congregation in New York and Semone gave Hilda a *get*.  The *Beth Din* supervised the *get*, and several weeks later a rabbi from the Lisker Congregation executed a letter confirming that Semone had obtained a Jewish divorce in the rabbi's presence on November 12, 1986.  Semone presented the rabbi's letter to the *Beth Din* of America in New York, and on

---

[3]*Beth Din* is the rabbinical term for a Jewish court of law.  See Linda S. Kahan, "Jewish Divorce and Secular Courts:  The Promise of Avitzur," 73 Geo. L. J. 193, 193 n.3 (1984).

**[*8]** December 22, 1986, the *Beth Din* of America issued a second letter

confirming that Semone was Jewish and free to be married according to Jewish

law.

As part of their marriage registration process, Semone and Ziona traveled to

Israel and presented evidence of the *get* to the Tel Aviv *Beth Din*.  A rabbi from

the Tel Aviv *Beth Din* signed the letter from the *Beth Din* of America, noting that it

was "allowed" on December 25, 1986.  Semone and Ziona were then issued a form

*ketubah* (marriage contract), see id. at 193 n.2, 197-198, permitting them to marry

in Israel.

On January 14, 1987, Semone and Ziona were married in Herzliya, Tel

Aviv, Israel, in a traditional Orthodox Jewish religious ceremony.  Semone and

Ziona completed and signed the *ketubah* and were issued a marriage certificate by

the Israeli Ministry of Religious Services.[4]  The certificate noted that, before

entering the marriage, Ziona was single and Semone was divorced.

After their marriage ceremony in Israel, Semone and Ziona returned to New

York and continued to live there until Semone's death in 2014.  During those

---

[4]A copy of the *ketubah* and two copies of the marriage certificate, including an apostilled version, appear in the record of this case.  An apostille is an international method, similar to notarization, for verifying the authenticity of foreign official records.  See Corovic v. Mukasey, 519 F.3d 90, 93 n.2 (2d Cir. 2008).

[*9] 27 years, Semone and Ziona lived together as husband and wife. They had two children and shared a home and finances. The record includes copies of Semone and Ziona's Federal income tax returns for the years 2000, 2007, 2010, 2011, 2012, and 2013. For each year, they filed as "married filing jointly." Semone and Ziona also purchased a burial plot in Israel, where Semone is now buried alongside Ziona's parents. In Semone's Last Will and Testament dated August 7, 2013, Semone directed that "any reference to 'my wife' * * * shall mean and refer to Ziona Grossman and only to Ziona Grossman[.]"

Hilda continued to live in New York until her own death in 2014. She saw Semone and Ziona socially from time to time. The record includes copies of Hilda's Federal income tax returns for the years 2011, 2012, 2013, and 2014. For each year, Hilda filed as "single." When Semone died in New York in 2014, Hilda made no statutory claim against his estate as a surviving spouse. New York law permits such an action, authorizing a surviving spouse to make an election to take up to one-third of a decedent's net estate. N.Y. Est. Powers & Trusts Law sec. 5-1.1-A(a)(2) (McKinney 2021).

[*10] B.      The Estate Tax Controversy

Semone had a large estate at the time of his death, valued (according to the Estate) at approximately $87 million on a gross basis.  The bulk of the estate (valued at approximately $79 million) was bequeathed to Ziona.

The Estate, which is being administered under the laws of New York, timely filed its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, with the Internal Revenue Service ("IRS").  On the return, the Estate claimed a marital deduction under section 2056(a) with respect to the assets bequeathed to Ziona.

On March 8, 2018, the Commissioner mailed to the Estate a notice of deficiency that determined a Federal estate tax deficiency of $35,497,032.  The notice also determined an accuracy-related penalty under section 6662 of $7,099,406.  Most of the adjustments in the notice were attributable to the Commissioner's determination that Semone and Ziona were not married to each other for Federal estate tax purposes and thus that Ziona did not qualify as Semone's surviving spouse within the meaning of section 2056(a).

The Estate timely filed a petition with this Court to challenge the deficiency determined by the Commissioner.  The Commissioner moved for partial summary judgment under Rule 121, arguing that Ziona is not Semone's surviving spouse

**[\*11]** "under state law properly applied" and that no genuine issue of material fact remains with respect to this question. The Estate responded in opposition to the Commissioner's motion and simultaneously filed a competing motion for partial summary judgment. The Estate's motion agreed that no genuine issue of material fact remains, but framed the central question differently, arguing that Semone was married to Ziona (and thus that Ziona is Semone's surviving spouse) "for Federal estate tax purposes."

The Commissioner filed a response to the Estate's motion, as well as a reply to the Estate's response to the Commissioner's motion. The Commissioner maintained in both filings that Ziona is not Semone's surviving spouse under State law properly applied, and that the Court should rule on that basis.[5] The Estate

---

[5]The Commissioner also filed a motion under Rules 52 and 143(g) requesting that the Court strike from the record certain materials the Estate filed. The materials included memoranda and reports relating to aspects of marriage and divorce under Israeli and Jewish religious law and opining on the validity of Semone and Ziona's marriage under that law. Under Rule 146, in determining foreign law, the Court is permitted to consider any material or source, whether or not submitted by a party or otherwise admissible. Additionally, a determination with respect to foreign law is treated as a ruling on a question of law. Rule 146. Because the Estate submitted the relevant materials to aid the Court in its determination of foreign law, Rule 143(g) is inapplicable. See Rule 146. Nor do we find the conditions set out in Rule 52 to be met here. See Rule 52 (permitting the striking of "any redundant, immaterial, impertinent, frivolous, or scandalous matter"). Accordingly, we will deny the Commissioner's motion to strike the materials. Nevertheless, we have found it unnecessary to rely on the materials the

[*12] replied to the Commissioner's response, again asserting that Semone was married to Ziona for Federal estate tax purposes.

After a conference call with the parties on December 3, 2020, the Court provided the Commissioner with an opportunity to supplement his motion and his response to the Estate's motion. The Commissioner filed his supplementary materials on January 8, 2021, and the Estate responded on January 25, 2021. We held a hearing on both motions on February 25, 2021, during which the parties were heard.

## Discussion

I. Legal Framework

A. Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary

---

Estate submitted in reaching our decision, so, in a practical sense, the question of the Commissioner's objections to those materials is moot.

**[\*13]** judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. However, the nonmoving party may not rest upon mere allegations or denials in his pleadings, but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see also Sundstrand Corp. v. Commissioner, 98 T.C. at 520.

B.    "Surviving Spouse" Under Section 2056(a)

Section 2001(a) imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Section 2056(a) provides that, "[f]or purposes of the tax imposed by section 2001, the value of the taxable estate shall * * * be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse." Put differently, if an interest in property passes to the decedent's "surviving spouse," the decedent's estate generally avoids paying tax with respect to the value of that interest. See Estate of Morgens v. Commissioner, 133 T.C. 402, 409-410 (2009) ("The policy behind the marital deduction rule is that property passes untaxed from the first spouse to die to his or her surviving spouse but is then included in the estate of the surviving spouse."), aff'd, 678 F.3d 769 (9th Cir. 2012). As a result, one's status as the

**[\*14]** surviving spouse is crucially important for the application of the Federal

estate tax rules.

Our Court has held that the identification of a decedent's surviving spouse is

a Federal issue that should be determined by applying State law--typically, the law

of the State where the decedent's estate is administered.  See Estate of Goldwater

v. Commissioner, 64 T.C. 540, 550 (1975) ("In our view the congressional intent

in enacting section 2056 was that the term 'surviving spouse' refers to the same

person who is the surviving spouse under the law of the State in which the

decedent's estate is being administered."), aff'd, 539 F.2d 878 (2d Cir. 1976); see

also Estate of Steffke v. Commissioner, 64 T.C. 530, 534 (1975) ("Marriage, its

existence and dissolution, is particularly within the province of the States."), aff'd,

538 F.2d 730 (7th Cir. 1976).[6]  If the courts of the relevant State have ruled on the

validity of the marriage at issue, we generally will follow those rulings.  See Estate

of Steffke v. Commissioner, 64 T.C. at 538; see also Estate of Goldwater v.

Commissioner, 539 F.2d at 880.  Rulings from other States, however, do not

necessarily bind us.  See Estate of Spalding v. Commissioner, 537 F.2d 666, 668

(2d Cir. 1976), rev'g T.C. Memo. 1975-250.  There is no dispute in this case that

---

[6]Because Semone died in 2014, we need not decide whether section 301.7701-18(b)(2), Proced. & Admin. Regs., which became effective in 2016, modifies the standards set forth in the authorities cited in the text.  See infra note 7.

**[\*15]** Semone, Ziona, and Hilda all resided in the State of New York at all relevant times, that Semone died in New York, and that the Estate is being administered in New York.

The Commissioner argues we should apply <u>Estate of Goldwater</u> in this case, maintaining that, because Semone, Ziona, and Hilda were all New York residents at the time of Semone's death and during all other relevant times, we must look to New York law "properly applied" to identify Semone's surviving spouse.

The Estate, by contrast, contends that an analysis of New York law is unnecessary. In the Estate's view, the Commissioner is bound by certain IRS revenue rulings that establish a "place of celebration" test to assess the validity of a marriage for Federal tax purposes. <u>See</u> Rev. Rul. 2013-17, 2013-38 I.R.B. 201; Rev. Rul. 58-66, 1958-1 C.B. 60; Rev. Rul. 53-29, 1953-1 C.B. 67. Under this approach, Semone's marriage to Ziona would be valid so long as it was valid in the place of celebration, i.e., Israel, without regard to the law of the State where the parties lived.[7]

---

[7]Section 301.7701-18(b)(2), Proced. & Admin. Regs., which became effective in 2016, formalized the place of celebration test for Federal tax purposes. The regulation requires that, in addition to being valid under the law of the place of celebration, a foreign marriage must also be recognizable under the laws of at least one State: "Two individuals who enter into a relationship denominated as marriage under the laws of a foreign jurisdiction are recognized as married for

[*16] Alternatively, the Estate contends, we may resolve this case based on Estate of Spalding, a decision by the U.S. Court of Appeals for the Second Circuit, to which an appeal in this case would lie under section 7482(b)(1)(A) unless the parties agree otherwise.[8] Estate of Spalding analyzes section 2056 and suggests that, if no court from the State in which a decedent's estate is administered (here, New York) has declared the decedent's marriage invalid, then the Commissioner is precluded from challenging the marriage. See Estate of Spalding v.

---

federal tax purposes if the relationship would be recognized as marriage under the laws of at least one state, possession, or territory of the United States, regardless of domicile." Id. The regulation became effective after Semone's death and therefore does not apply here.

[8]Because there is no dispute that the Estate is being administered under the laws of New York, the decedent died in New York, and the executor of the Estate resided in New York when the petition was filed, we need not decide which of these facts determines the appellate venue under section 7482(b)(1)(A). See Estate of Clack v. Commissioner, 106 T.C. 131, 140-141 (1996) (concluding it was unnecessary to decide the question of proper appellate venue for a Federal estate tax case); id. at 145-149 (Gerber, J., concurring) (concluding that appellate venue depends on domicile of decedent); id. at 142 (Chabot, J., concurring in result) (agreeing with Judge Gerber on appellate venue); id. at 152, 159-167 (Parker, J., dissenting) (concluding that appellate venue depends on residence of executor of estate). Compare Estate of Thompson v. Commissioner, 382 F.3d 367, 374 n.12 (3d Cir. 2004) (concluding without significant discussion that residence of executor controls in Federal estate tax case), aff'g T.C. Memo. 2002-246, with Estate of Israel v. Commissioner, 159 F.3d 593, 595 (D.C. Cir. 1998) (reaching the same conclusion in Federal income tax case), rev'g and remanding 108 T.C. 208 (1997), and Kruskal v. United States, 178 F.2d 738, 740 (2d Cir. 1950) (addressing the issue in Federal estate tax refund claim case).

[*17] <u>Commissioner</u>, 537 F.2d at 668 (holding that, despite a New York judgment invalidating husband's prior divorce, his subsequent marriage to a California resident was valid for Federal estate tax purposes; any pronouncement to the contrary would need to be made by a California court). This reading presumably would resolve this case in the Estate's favor because no New York court has ruled on the validity of Semone and Ziona's marriage.[9]

Finally, the Estate maintains that, even if we ignore the revenue rulings and <u>Estate of Spalding</u> and rely instead on New York law (as the Commissioner contends we should), the Estate still prevails.

Because the Estate argues that it prevails even under the standard advocated by the Commissioner, for purposes of ruling on the motions before us we assume (without deciding) that we must look to New York law to decide whether Ziona is Semone's surviving spouse. After reviewing the applicable New York law, we conclude that she is. Accordingly, we need not resolve whether we are required to

---

[9]This conclusion would not be inconsistent with U.S. Court of Appeals for the Second Circuit cases that analyze a marriage's validity in the context of adjudicating social security benefits, because those cases involve a statute that, unlike section 2056, specifically provides that marital status should be determined according to what the courts of the domiciliary State would decide if presented with the issue. <u>See, e.g.</u>, <u>Steele v. Richardson</u>, 472 F.2d 49 (2d Cir. 1972) (applying 42 U.S.C. section 416(h)(1)(A)); <u>Dolan v. Celebrezze</u>, 381 F.2d 231 (2d Cir. 1967) (same).

[*18] apply New York law, the revenue rulings, or Estate of Spalding to determine Ziona's status under section 2056(a).  See, e.g., UnionBancal Corp. v. Commissioner, 113 T.C. 309, 316-317 (1999) (declining to determine whether temporary regulation was entitled to deference under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), because regulation was valid even under a less deferential standard of review), aff'd, 305 F.3d 976 (9th Cir. 2002).

Before turning to our analysis of New York law, we pause in Part II to provide a brief summary of the rules that apply to marriages and divorces of Jewish persons under Israeli law.  These rules will inform our discussion of New York's place of celebration rule in Part III.

II.     Israeli Rules on Marriage and Divorce of Jewish Persons

Since its inception, Israel has maintained a bifurcated legal system that incorporates both civil and religious law, each with jurisdiction over different aspects of daily life.  See Asher Maoz, "Enforcement of Religious Courts' Judgments under Israeli Law," 33 J. Church & St. 473, 473-475 (1991).  This arrangement traces its origin to the laws of the Ottoman empire.  See Isaac S. Shiloh, "Marriage and Divorce in Israel," 5 Isr. L. Rev. 479, 481-482 (1970).

As relevant here, citizens or residents of Israel who belong to a designated religious community are subject to that community's laws in certain matters of

[*19] personal status, including marriage and divorce, and each religious community has a system of religious courts that are authorized by the state. See Maoz, supra, at 473-475; Shiloh, supra, at 485; see also Edwin Freedman, "Family Law in Israel:  Overview," Practical Law Country Q&A (Westlaw 2020).  For Jewish couples, therefore, matters of marriage and divorce in Israel are governed by Jewish religious law and are exclusively within the jurisdiction of Israel's rabbinical courts.[10]  See Maoz, supra, at 474-475; Shiloh, supra, at 484; see also Hassan v. Holder, 604 F.3d 915, 925 n.7 (6th Cir. 2010).

Before marrying in Israel, a Jewish couple must present the rabbinical courts with evidence of their eligibility to marry under Jewish law.  See Marriage, U.S. Embassy in Israel, https://il.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/marriage/ (see Marriage between Jews) (last visited May 3, 2021).[11]  The evidence must establish that both individuals are Jewish and unmarried.  See

---

[10]Individuals who are not affiliated with a designated religious community or who have spouses who are affiliated with a different religious community generally are subject to Israeli civil law in matters of marriage and divorce.  See Edwin Freedman, "Family Law in Israel:  Overview," Practical Law Country Q&A, at Q&A-1, Q&A-10 (Westlaw 2020).

[11]Similar information is available in Hebrew on the official website of Israel's Ministry of Religious services.  See Ministry of Religious Services, Israel Government Services and Information, https://www.gov.il/en/departments/ministry_of_religious_services (last visited May 3, 2021).

[*20] id.  If either individual has been married to another Jewish person previously,
then the couple must demonstrate that the prior marriage has been dissolved.  See
id.  Bigamy is illegal in Israel.  See Pinhas Shifman, "Family Law in Israel:  The
Struggle Between Religious and Secular Law," 24 Isr. L. Rev. 537, 539 (1990).

For purposes of Jewish religious law, a marriage can be dissolved only upon
the death of one of the spouses or by means of divorce.  See Lisa Zornberg,
"Beyond the Constitution:  Is the New York Get Legislation Good Law?," 15 Pace
L. Rev. 703, 703 n.2 (1995); J. David Bleich, "Jewish Divorce:  Judicial
Misconceptions and Possible Means of Civil Enforcement," 16 Conn. L. Rev. 201,
201 (1984).  A *get* (i.e., a religious divorce) is the only means of obtaining a
divorce; a civil divorce has no effect on an individual's eligibility to remarry under
Jewish religious law.  See Zornberg, supra, at 703; see also Freedman, supra,
at Q&A-10.  If a Jewish person presents evidence of a *get* validly provided in
another country under the supervision of that country's rabbinical courts, then
Israel's rabbinical courts will recognize the *get*.[12]  See Freedman, supra, at Q&A-
10 ("[I]f an Israeli couple divorces in a recognised rabbinical court in England,
even though they may not be divorced under English law, their divorce will be

---

[12]Semone and Ziona followed this procedure when they presented letters
from the *Beth Din* of America and the Lisker congregation to the Tel Aviv *Beth
Din*.

**[*21]** recognised by the Israeli Rabbinical Courts, which will permit them to register as divorced and to remarry.").  Such an individual would be considered divorced (and therefore single) under Jewish religious law and would be eligible to remarry in Israel.  See id.

Once Israel's rabbinical courts have confirmed that a Jewish couple satisfies the eligibility requirements, the couple is issued a form *ketubah* (that is, the marriage contract).  The couple signs the *ketubah* before the wedding ceremony, which is performed by a rabbi in accordance with Jewish religious traditions. After the ceremony, Israel issues a marriage certificate, which constitutes proof that the couple is married for purposes of Israeli law.  As noted above, an apostilled copy of Semone and Ziona's marriage certificate appears in the record of this case.

With this background in mind, we turn now to an analysis of Semone and Ziona's marriage under New York law.

III.   New York Law on the Recognition of Marriages Celebrated Outside
       New York

This case turns on the identity of Semone's surviving spouse for Federal estate tax purposes, a question to be decided (we assume for purposes of the motions before us) based on New York law.  The Commissioner focuses his

[*22] analysis on Semone and Hilda's divorce, arguing that Hilda is the surviving spouse because she and Semone never validly divorced under New York law. Accordingly, the Commissioner insists, no subsequent marriage, including Semone's marriage to Ziona, would be respected in New York. The Estate, on the other hand, looks first to Semone and Ziona's marriage. It maintains that Ziona is Semone's surviving spouse because New York applies a place of celebration rule and there is no dispute that the marriage was valid in Israel, the place of celebration. In the Estate's view, the place of celebration rule encompasses the determination of whether prospective spouses are eligible to be married. The Estate therefore concludes that New York would accept Israel's determination regarding the sufficiency of Semone and Hilda's divorce for purposes of Semone's later marriage to Ziona. As described above and further below, we agree that the analysis should focus on Semone and Ziona's marriage and that the place of celebration rule controls the outcome of this case. We also conclude that the Commissioner's insistence on focusing on the status of Semone and Hilda's religious divorce exclusively under New York law is misplaced.

A.    Place of Celebration

The question of whether New York residents who celebrate marriages outside New York should be considered to be legally married in New York is not

**[*23]** new. Since at least 1881, the New York Court of Appeals, the highest court

in New York,[13] has recognized the "general rule of law that a contract entered into

in another State or country, if valid according to the law of that place, is valid

everywhere." Van Voorhis v. Brintnall, 86 N.Y. 18, 24 (1881). As applied to

marriages, "the rule recognizes as valid a marriage considered valid in the place

where celebrated." Id. at 25. Moreover, "'[w]e all know * * * that in questions of

marriage contract, the lex loci contractus [the law of the place of the contract] is

that which is to determine the status of the parties,' and * * * this by consent of all

nations is jus gentium [the law of nations or international law]." Id. (quoting

Connelly v. Connelly, 2 Eng. L. & Eq. 570 (1851)). This rule is subject to two

exceptions: cases "first of incest or polygamy coming within the prohibitions of

natural law [and] second, of prohibitions by positive law." Id. at 26 (citations

omitted).[14] But the exceptions are narrow.

---

[13]As the U.S. Supreme Court said in West v. Am. Tel. & Tel. Co., 311 U.S. 223, 236 (1940): "[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted."

[14]As the New York Court of Appeals summarized the law in Matter of May, 305 N.Y. 486, 490 (1953):

**[\*24]** For example, in <u>Matter of May</u>, 305 N.Y. 486, 488 (1953), the New York Court of Appeals was asked to decide whether the marriage of an uncle and his niece by half blood celebrated in Rhode Island--where the marriage was valid--could be given effect in New York where the statute declared a marriage between an uncle and his niece incestuous and void. In holding that the marriage was respected in New York, the court followed the principle recognized in <u>Van Voorhis</u> and concluded that neither of the two exceptions applied. <u>Id.</u> at 491.

With respect to the first exception, the court observed that the marriage "solemnized, as it was, in accord with the ritual of the Jewish faith in a State whose legislative body has declared such a marriage to be 'good and valid in law', was

---

We regard the law as settled that, subject to two exceptions presently to be considered, and in the absence of a statute expressly regulating within the domiciliary State marriages solemnized abroad, the legality of a marriage between persons <u>sui juris</u> is to be determined by the law of the place where it is celebrated. (<u>Van Voorhis v. Brintnall</u>, 86 N.Y. 18, 24; <u>Thorp v. Thorp</u>, 90 N.Y. 602, 605-606; <u>Moore v. Hegeman</u>, 92 N.Y. 521, 524; <u>Medway v. Needham</u>, 16 Mass. 157, 159-160; <u>Fensterwald v. Burk</u>, 129 Md. 131; Restatement, Conflict of Laws, §§ 121. 131, 132; Story on Conflict of Laws [7th ed.], § 113; 2 Beale. Conflict of Laws, pp. 669-670; 1 Bishop on Marriage, Divorce and Separation, § 856.)

<u>See also</u> <u>Matter of Mott v. Duncan Petroleum Trans.</u>, 51 N.Y.2d 289, 292-293 (1980) (applying the place of celebration rule to common-law marriages and holding that the "quite liberal" Georgia law with respect to such unions must be followed in determining the existence of a marriage even though New York itself did not recognize common-law marriages).

[*25] not offensive to the public sense of morality to a degree regarded generally with abhorrence and thus was not within the inhibitions of natural law." Id. at 493.[15]

With respect to the second exception, the court observed that, although the relevant New York statute "declares to be incestuous and void a marriage between an uncle and a niece and imposes penal measures upon the parties thereto, it is important to note that the statute does not by express terms regulate a marriage solemnized in another State where, as in our present case, the marriage was concededly legal." Id. at 491. Thus, "absent any New York statute expressing clearly the Legislature's intent to regulate within this State marriages of its domiciliaries solemnized abroad, there is no 'positive law' in" New York barring the recognition of the marriage. Id. at 493.[16]

---

[15]The spouses in Matter of May, 305 N.Y. at 489, "entered into a ceremonial marriage performed by and at the home of a Jewish rabbi."

[16]The New York Court of Appeals' decision rejected the position taken by the Surrogate's Court. Like the Commissioner here, the lower court had concluded that "although the marriage of * * * [the husband] and the decedent [wife] in Rhode Island in 1913 was valid in that State, such marriage was not only void in New York as opposed to natural law but is contrary to the provisions of subdivision 3 of section 5 of the Domestic Relations Law." Matter of May, 305 N.Y. at 489-490. In the New York Court of Appeals' view, that conclusion was contrary to Van Voorhis v. Brintnall, 86 N.Y. 18 (1881), where the Court of Appeals "gave careful consideration to, and held against the application of two

**[*26]** The conclusion in <u>Matter of May</u> was fully aligned with that in <u>Van Voorhis</u>, which cited with approval an earlier case holding that the New York law's criminal prohibition against bigamy did not apply when the second marriage took place in Canada. <u>Van Voorhis</u>, 86 N.Y. at 31 (citing <u>People v. Mosher</u>, 2 Par. Cr. Rep. 195 (1855)). Turning to the civil case before it, the <u>Van Voorhis</u> court asked rhetorically: "Now if the criminal court has no jurisdiction to punish the act when committed out of the State, how has the civil court jurisdiction to prohibit the doing of the act out of the State?" <u>Id.</u> at 32. Answering its own question, the court went on to conclude: "The statute does not in terms prohibit a second marriage in another State, and it should not be extended by construction." <u>Id.</u>

New York courts have consistently followed the rules set out in <u>Van Voorhis</u>. See, e.g., <u>Matter of May</u>, 305 N.Y. at 491; <u>Moore v. Hegeman</u>, 92 N.Y. 521, 524-525, 528 (1883); <u>Matter of Ranftle</u>, 81 A.D.3d 566, 567 (1st Dep't 2011); <u>Martinez v. County of Monroe</u>, 50 A.D.3d 189, 191-192 (4th Dep't 2008); <u>Matter of Peart</u>, 277 A.D. 61, 64-65, 68-69 (1st Dep't 1950). Indeed, they have done so even when New York residents have gone out of the State "for the purpose of

_____

exceptions to * * * [the place of celebration] rule--viz., cases within the prohibition of positive law; and cases involving polygamy or incest in a degree regarded generally as within the prohibition of natural law." <u>Matter of May</u>, 305 N.Y. at 491.

[*27] evading * * * [New York's marriage] laws, returning to * * * [New York] on the day of the marriage, and thereafter residing" in New York. Thorp v. Thorp, 90 N.Y. 602, 605 (1882); see also Van Voorhis, 86 N.Y. at 23 (summarizing the trial court's findings in that case).

There is no genuine dispute here that Semone and Ziona celebrated their marriage in Israel in 1987 and that Israel considered Semone and Ziona validly married. The Estate has submitted an apostilled Israeli marriage certificate, along with a completed *ketubah* and other documents. The Commissioner has presented no evidence to challenge the authenticity of these documents or otherwise to cast doubt on their validity.[17] Thus, under Van Voorhis and its progeny, we conclude that New York would respect Semone and Ziona's marriage unless one of the two

---

[17]At various points, the Commissioner has suggested that there is more to this case than meets the eye and that issues could be raised with respect to, for example, the validity of the *get* under Israeli law or how certain individuals viewed Semone and Ziona's relationship. But despite being given several opportunities to raise a genuine issue of material fact, the Commissioner has failed to do so. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for * * * [the return of] a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (Citations omitted.)). Under our rules, as noted above, the nonmoving party may not rest upon mere allegations or denials, but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see also Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).

[*28] exceptions applies.  The Commissioner argues strenuously that both exceptions apply and render the marriage void.  We now turn to those arguments.

1.     The First Exception

To begin with, the Commissioner contends that Semone and Ziona's marriage is contrary to public policy, "coming within the prohibitions of natural law," because it is bigamous.  See Van Voorhis, 86 N.Y. at 26.  The argument goes like this:  New York courts do not recognize religious divorces, such as the *get* Semone gave to Hilda in New York before Semone and Ziona celebrated their marriage in Israel.  Because the *get* was insufficient to dissolve Semone and Hilda's marriage for purposes of New York law, Semone and Hilda were not validly divorced and any subsequent marriage by Semone would be bigamous.  If Semone and Ziona had sought to get married in New York relying on the *get*, they would not have been able to.  Semone and Ziona, the Commissioner maintains, cannot evade the requirements of New York law by having Hilda receive a *get* from Semone in New York, having that *get* acknowledged in Israel, and getting married in Israel.

The Commissioner's argument is flawed in several respects.  First, the Commissioner begins his analysis by asking whether Semone and Hilda were validly divorced and relies exclusively on New York law to determine the answer.

**[*29]** But that is the wrong starting question, and the Commissioner looks to the wrong jurisdiction for the governing law. Under section 2056(a)--the provision at issue in this case--the Court must determine whether Ziona was Semone's "surviving spouse" for Federal estate tax purposes. Accordingly, the proper starting question is whether Semone and Ziona were validly married. To answer that question, given the parties' positions on this score, we assume (without deciding) that we should look to New York law. And New York law in turn requires us to consider the rules of the place of the celebration of the marriage, here Israel.

It is well established that capacity to marry is a prerequisite for marriage and that the prerequisites for marriage are also determined by the place of celebration. As the New York Court of Appeals in Van Voorhis, 86 N.Y. at 25 (quoting Connelly, 2 Eng. L. & Eq. 570), put it: "We all know * * * that in questions of marriage contract, the lex loci contractus [the law of the place of the contract] is that which is to determine the status of the parties." This includes whether a person seeking to remarry has been validly divorced. The Restatement (Second) of Conflict of Laws, on which the Commissioner relies, highlights the same point. Restatement, Conflict of Laws 2d, sec. 283 cmt. h (1971) ("[A] marriage will usually be valid everywhere if it complies with the requirements of the state where

**[*30]** it was contracted as to such matters as * * * the capacity of either party to marry[.]"). Caselaw and other Federal agencies agree on this principle. See, e.g., Jahed v. Acri, 468 F.3d 230, 235 (4th Cir. 2006) ("Ordinarily, in the immigration context, the validity of a prior divorce is addressed to determine whether a subsequent marriage is lawful. See, e.g., Matter of Hosseinian, 19 I. & N. Dec. 453 (BIA 1987). In such situations, the * * * [Board of Immigration Appeals] 'look[s] to the law of the state where the subsequent marriage was celebrated to determine whether or not that state would recognize the validity of the divorce.' Id. at 455.").

Here, there is no dispute that Israel--the place of Ziona's marriage celebration--viewed Semone and Hilda as validly divorced and Semone as capable of remarrying. This was demonstrated by Israel's acceptance of the letter from the *Beth Din* of America, the issuance of a *ketubah* to Semone and Ziona, and the later issuance of a marriage certificate. Under Israeli law, religious divorces (i.e., *gets*) are fully recognized. Indeed, they are the only way for people of Jewish faith who have been married before to make themselves eligible to remarry another Jewish person in Israel. See supra Part II. Since New York law requires us to look to the law of the place of the marriage celebration to determine the parties' capacity to marry, New York law also requires us to defer to the place of celebration and its

[*31] determination on whether one of those parties was validly divorced and therefore capable to remarry.[18]  See, e.g., Matter of May, 305 N.Y. at 491. Applying this standard, we would expect the New York Court of Appeals to accept Israel's determination that Semone and Hilda's marriage had ended, leaving Semone free to marry Ziona.[19]

Although the Commissioner repeatedly invokes the concept of "bigamy," the analysis above demonstrates that Semone and Ziona's marriage was not bigamous either in Israel or in New York.  This conclusion is fully consistent with New York's interpretation of bigamy from a criminal law perspective. Specifically, even if one believed that Semone and Hilda remained married from a New York perspective after 1986, the act of contracting the marriage to Ziona in

---

[18]It bears repeating that Semone and Ziona did not seek to enter into a marriage contract in New York.  Therefore, New York's own rules as the place of celebration are not triggered.  That Semone and Ziona might not have been able to get married in New York had they attempted to do so is irrelevant to whether they could be validly married elsewhere.

[19]We note here that the Israeli authorities were fully aware of Semone's prior marriage to Hilda, distinguishing this case from those in which one of the parties to the second marriage fails to inform the place of celebration of a prior marriage and simply acts as if the prior marriage did not exist.  See, e.g., Dolan, 381 F.2d at 233-236 (describing several cases in which one spouse's dishonesty regarding a prior marriage was a factor weighing against the validity of a later marriage).  In those cases, the second marriage presumably would be invalid in the place of celebration as well.

**[\*32]** 1987 took place outside New York, and New York courts have held that such marriages do not satisfy the statutory definition of bigamy. See People v. Hess, 286 A.D. 617, 619 (3d Dep't 1955) ("[A] person is not guilty of bigamy because he lives in this State with a partner to an illegal second marriage contracted elsewhere."); see also Van Voorhis, 86 N.Y. at 30-35 (collecting and analyzing authorities).

More generally, the Commissioner fails to recognize that the public policy exception to the place of celebration rule is narrow. The New York Court of Appeals has held that the exception applies when a marriage falls "within the inhibitions of natural law" because it is "offensive to the public sense of morality to a degree regarded generally with abhorrence." See Matter of May, 305 N.Y. at 493. We cannot agree that Semone and Ziona's marriage falls under this standard. This is not a case in which one spouse sought to cohabit with two or more other "spouses" at the same time. Semone was a serial monogamist who sought to end his marriage to Hilda before his marriage to Ziona began. All the parties most intimately involved in both marriages appear to have understood that Semone and Hilda were divorced and that Semone and Ziona were married.[20]

_____

[20]Hilda was familiar with the New York rules for challenging an invalid marriage, as demonstrated by the declaratory judgement action she brought in the

**[*33]** Despite the Commissioner's efforts to show otherwise, we do not see how New York's policy interest in preventing marriages involving incest, polygamy, and the like would be implicated here.

New York does, of course, have a policy interest in dictating the steps for obtaining a divorce in New York. The Commissioner argues that accepting Semone and Ziona's marriage would undercut the general refusal of New York courts to recognize religious divorces. But New York has implicitly prescribed the relevant steps for obtaining a divorce in this case by adopting a place of celebration rule for marriages contracted outside the State.[21] And, even if that were not the

---

Supreme Court of the State of New York against Semone and Katia in 1974. She had 27 years to bring a similar action against Semone and Ziona if she believed their marriage to be invalid. But she did not.

[21]The cases cited by Commissioner generally concern the validity of subsequent marriages that were celebrated in New York or a similar State that did not recognize the validity of a religious divorce, rather than in a country that did recognize the validity of such divorces. See, e.g., Shikoh v. Murff, 257 F.2d 306 (2d Cir. 1958) (husband was not entitled to adjustment of immigration status based on marriage to second wife in New York when divorce from first wife was premised on an Islamic divorce obtained in Brooklyn); In re Spiegel, 24 F.2d 605 (S.D.N.Y. 1928) (second marriage celebrated within the United States was bigamous for purposes of immigration determination when husband prepared a *get* in New York and mailed it to his first wife in Poland, but otherwise took no steps to obtain a divorce). The Commissioner has cited no case in which a New York court, at the request of an outsider to the marriage, has held invalid a marriage that was valid at the place of its celebration. For example, the Commissioner cites Magner v. Hobby, 215 F.2d 190 (2d Cir. 1954), in which the Second Circuit

[*34] case, we are aware of no authority that equates a policy interest in dictating

divorce formalities with those that implicate "natural law" concerns. See Van

Voorhis, 86 N.Y. at 26 (describing prohibitions of "natural law" as consisting of

incest and polygamy). In Matter of May, 305 N.Y. at 491, moreover, the New

York Court of Appeals held that even New York's strong policy against incest

must yield to the place of celebration rule in certain circumstances. The husband

and wife in Matter of May would not have been able to get married in New York

_____

invalidated the Connecticut marriage of two New York residents after Mexican "divorces by mail" that purported to terminate their earlier marriages. But the parties in that case did not even attempt to argue that Connecticut--the place of celebration for the second marriage--would have respected the Mexican divorces. Id. at 193. Indeed, they did not defend the validity of the second marriage at all. See id.; see also Caldwell v. Caldwell, 298 N.Y. 146, 147-150 (1948) (husband was correct that his later marriage in Virginia was invalid when it was premised on a Mexican "divorce by mail" that his first wife said was "valueless").

Similarly, the Commissioner's reliance on Earle v. Earle, 141 A.D. 611 (1st Dep't 1910), which involved a later marriage in Italy, is misplaced. First, the law of the place of celebration in that case (Italy) was not proven, so the court assumed that law would be the same as New York law. Here, it is undisputed that Israeli law differs from New York law when it comes to the effect of religious divorces for adherents of the Jewish faith. Second, the court in that case concluded that, at the time of the celebration of the second marriage, "the bonds of matrimony [from the first marriage remained] in full force." Id. at 613. That is not so here; from an Israeli law perspective, the bonds of matrimony from the first marriage had been duly severed. Third, unlike Earle, which involved a second wife's action to annul her own marriage celebrated abroad, here the Commissioner seeks to have a marriage celebrated abroad declared invalid over the objection of one of the spouses and when the spouse from the first marriage registered no objection to the second marriage for nearly three decades.

**[*35]** because their relationship would have been incestuous under the terms of the New York statute. Nevertheless, their marriage by a Jewish rabbi in Rhode Island was respected by New York, notwithstanding New York's own contrary rule. Id. The Commissioner offers no persuasive reasons why the New York Court of Appeals should be expected to reject the marriage at issue here when it accepted as valid the marriage in Matter of May.[22]

Van Voorhis offers the same lesson. The husband in that case had committed adultery during his first marriage. Van Voorhis, 86 N.Y. at 23. His first wife obtained a divorce, but under the applicable New York statute, the husband was prohibited from remarrying during the first wife's lifetime. Id. Had he attempted to remarry in New York, the marriage would have been bigamous and void. Id. at 25-26. Despite the New York restriction, indeed to evade it, the husband traveled to Connecticut to marry his second wife. Id. at 23. Applying the place of celebration rule after an extensive discussion of the relevant authorities, the New York Court of Appeals respected the second marriage, in effect deferring to Connecticut's judgment on whether the husband was freed from his prior marriage and eligible to remarry. See also Matter of Peart, 277 A.D. at 64-65,

---

[22]Similar arguments to those offered by the Commissioner were made in dissent in Matter of May, 305 N.Y. at 494-495, but they did not carry the day, as the majority opinion received five votes and the dissenting judge was alone.

**[*36]** 68-69 (involving a New York court's analysis of the effect of a Virginia divorce decree on a marriage celebrated in Maryland and holding that Maryland law governed the effect of the decree).

In light of the foregoing and based on the facts before us, we would expect the New York Court of Appeals to conclude that the first exception to the place of celebration rule does not apply to invalidate Semone and Ziona's marriage.

2.      The Second Exception

In addition, the Commissioner contends that Semone and Ziona's marriage violates New York positive law.  The Commissioner relies on article I, section 9 of the New York Constitution, which provides that no "divorce [shall] be granted otherwise than by due judicial proceedings."  There are two flaws with this argument.  First, as Van Voorhis, Thorp, and Matter of May make clear, because this provision does not purport to have extraterritorial effect, it cannot be violated by actions (the contracting of marriage) that take place outside New York.  See Matter of May, 305 N.Y. at 492; Thorp, 90 N.Y. at 606; Van Voorhis, 86 N.Y. at 31-32.  Second, and more fundamentally, recognition of a marriage celebrated outside New York is far different from the granting of a divorce.[23]  Here, the Estate

---

[23]Again, by focusing on the divorce, the Commissioner begins with the wrong question.  We do not pass here on the validity of the divorce in New York;

**[*37]** seeks recognition of Ziona's Israeli marriage to Semone.  We do not have

before us a request by a party to the first or second marriage with respect to a

divorce decree.[24]

_____

rather, we decide on the validity of the marriage in Israel.  In such cases, New York (as well as Federal caselaw and other Federal agencies) defers to the place of celebration (i.e., Israel) to determine whether the parties are eligible to marry.  Van Voorhis, 86 N.Y. at 25 ("[I]n questions of marriage contract, the lex loci contractus is that which is to determine the status of the parties[.]" (quoting Connelly v. Connelly, 2 Eng. L. & Eq. 570 (1851))); see also Matter of May, 305 N.Y. at 491 (place of celebration determines eligibility to marry); cf. Jahed v. Acri, 468 F.3d 230, 235 (4th Cir. 2006) ("Ordinarily, in the immigration context, the validity of a prior divorce is addressed to determine whether a subsequent marriage is lawful. See, e.g., Matter of Hosseinian, 19 I. & N. Dec. 453 (BIA 1987).  In such situations, the * * * [Board of Immigration Appeals] 'look[s] to the law of the state where the subsequent marriage was celebrated to determine whether or not that state would recognize the validity of the divorce.'  Id. at 455.").

[24]This point is key in distinguishing the cases the Commissioner cites, in which New York courts refused to recognize the validity of a *get*.  In each of them, a party to the first or second marriage (or heirs of the party) sought a ruling that affected their own status.  See, e.g., Chertok v. Chertok, 208 A.D. 161 (1st Dep't 1924) (granting annulment requested by second wife when she was unaware of husband's first marriage, which he had attempted to terminate in New York by means of a *get*); In re Estate of Goldman, 156 Misc. 817 (N.Y. Sur. Ct. 1935) (in a contest between second wife and children of first marriage over estate's letters of administration, *get* prepared in New York and ratified in Russia, where first wife lived, did not terminate first marriage); Shilman v. Shilman, 105 Misc. 461 (N.Y. Sup. Ct. 1918) (husband could not obtain New York divorce on grounds of adultery when he gave first wife a *get* and she returned to Russia, where she allegedly remarried), aff'd, 188 A.D. 908 (1st Dep't 1919), aff'd, 230 N.Y. 554 (1920) (per curiam); see also Matter of Atiram, 25 Misc. 3d 1231(A) (N.Y. Sur. Ct. 2009) (in an unreported decision, court agreed with wife that New York *get* following her marriage to husband in Israel did not preclude her election to claim

**[*38]**     3.     <u>Other Public Policy Considerations</u>

In its briefing and at the hearing on the competing motions, the Commissioner raised generalized concerns that finding Ziona to be Semone's surviving spouse would open the floodgates to other New Yorkers ending their New York marriages without notice to their existing New York spouses, contrary to New York public policy. The Court struggles to see how applying New York law that has been settled for 140 years to the facts before us will bring about such disconcerting results. The Commissioner's concerns are even more puzzling in light of the policy choice reflected in section 301.7701-18(b)(2), Proced. & Admin.

---

against husband's estate where there was no later marriage); <u>Tsirlin v. Tsirlin</u>, 19 Misc. 3d 1132(A) (N.Y. Sup. Ct. 2008) (in another unreported decision, a *get* obtained in New York and ratified in Israel was not a valid divorce under New York law where there was no later marriage and evidence suggested the parties did not consider themselves legally divorced). Those types of cases raise materially different concerns than cases in which the parties to the earlier marriage do not contest the validity of the subsequent marriage. <u>Cf.</u> <u>Imbrioscia v. Quayle</u>, 278 A.D. 144 (1st Dep't 1951) (in a case not cited by the Commissioner, the court invalidated a Mexican divorce despite the later marriage also taking place in Mexico where decedent's first wife was part of the case and actively disputed the second wife's claim and no one relied on the place of celebration rule), <u>aff'd</u>, 303 N.Y. 841 (1952). As discussed above, <u>see</u> <u>supra</u> note 20, Hilda did not challenge Semone and Ziona's marriage, although she knew how to do so and had more than sufficient time (27 years) to take that action had she wished to object. Moreover, <u>Chertok</u>, <u>Estate of Goldman</u>, and other cases relied on by the Commissioner have been criticized as reflecting a fundamental misunderstanding of the *get* and Jewish law. <u>See</u> J. David Bleich, "Jewish Divorce: Judicial Misconceptions and Possible Means of Civil Enforcement," 16 Conn. L. Rev. 201, 215-226 (1984).

**[*39]** Regs., which expressly adopts a place of celebration rule for Federal tax purposes, with the caveat that foreign marriages must be recognizable in at least one State.

Nevertheless, we emphasize that our ruling in this case is a narrow one. It addresses only our view on the New York Court of Appeals' expected recognition of Semone and Ziona's marriage, celebrated in Israel, uncontested for many years by the previous spouse, and left undisturbed by the New York courts. We make no broad pronouncements on how couples may or may not obtain valid divorces in New York. New York courts of course remain open to hear challenges by an existing spouse who believes that his or her current marriage is adversely affected (or not) by a subsequent marriage. As New York courts have observed, a spouse in those circumstances "may, without difficulty, maintain an action for declaratory judgment declaring the invalidity of a subsequent marriage or may * * * sue to annul the second marriage." Goldwater v. Goldwater, 180 N.Y.S.2d 383, 385 (1st Dep't 1958); see also Rosenbaum v. Rosenbaum, 309 N.Y. 371, 377 (1955) (noting that "[a] simple action for declaratory judgment" would be available to wife "at all times" if husband obtained a Mexican divorce and attempted to remarry).

**[\*40]** In short, we conclude that, on the facts before us that are not reasonably subject to dispute, the New York Court of Appeals would recognize Semone and Ziona's Israeli marriage and would treat Ziona as Semone's surviving spouse.

    B.    <u>New York Presumption in Favor of Second Marriage</u>

Our conclusion here is buttressed by New York law's presumption in favor of the validity of a second marriage.[25]  As the Second Circuit explained in <u>Grabois v. Jones</u>, 89 F.3d 97, 100 (2d Cir. 1996):

> [I]t is * * * well established New York law that when a court is confronted with the claim that a formal second marriage is invalid because of the existence of a valid first marriage, a strong presumption of validity attaches to the second marriage.  <u>See, e.g.</u>, <u>Seidel v. Crown Indus.</u>, 132 A.D.2d 729, 730, 517 N.Y.S.2d 310, 311 (3d Dep't 1987); <u>Frassetti v. Frassetti</u>, 57 A.D.2d 826, 826, 394 N.Y.S.2d 65, 65 (2d Dep't 1977); <u>In re Estate of Bihanskyj</u>, 55 A.D.2d 836, 837, 390 N.Y.S.2d 322, 323 (4th Dep't 1976).  The presumption of the validity of the second marriage, moreover, grows stronger and stronger where a substantial injustice would be created by invalidating that marriage.  <u>See</u> <u>Dolan v. Celebrezze</u>, 381 F.2d 231, 237-38 (2d Cir. 1967) (Friendly, J.) (canvassing New York cases and noting that the presumption favoring the validity of the second marriage varies in its force with the attendant facts and

---

[25]For a civil case, the Federal Rules of Evidence provide that State law governs the effect of a presumption with respect to any claim or defense for which State law supplies the rule of decision.  Fed. R. Evid. 302; <u>see also</u> sec. 7453 (providing that Tax Court proceedings are conducted in accordance with the Federal Rules of Evidence).  Additionally, "[t]he party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.  But this rule does not shift the burden of persuasion, which remains on the party who had it originally."  Fed. R. Evid. 301.  Under our Rule 142, the Estate has the burden of proving that it is entitled to the deduction.

**[*41]** circumstances).  "[T]he decisions that have held the second marriage to be valid on the basis of the presumption are explicable in terms of effectuating a particular public policy such as upholding legitimacy [or] <u>favoring the participation in the decedent's estate of one who lived with him as his spouse</u> . . . ."  <u>Id.</u> (emphasis added).

Moreover, "where, as here, the party actually challenging the validity of the marriage is a total stranger to the marital relation, the presumption becomes even stronger."  <u>Matter of Seidel v. Crown Indus.</u>, 132 A.D.2d 729, 730 (3d Dep't 1987) (citing <u>Matter of Meltzer v. McAnns Bar & Grill</u>, 85 A.D.2d 826 (3d Dep't 1981), <u>Matter of Esmond v. Lyons Bar & Grill</u>, 26 A.D.2d 884 (3d Dep't 1966), and <u>Matter of Inkpen v. Lehigh Constr. Co.</u>, 12 A.D.2d 692 (3d Dep't 1960), <u>appeal denied</u>, 9 N.Y.2d 609 (1961)).

The party challenging the marriage has "the burden to rebut the strong presumption."  <u>See id.</u> at 730.  It is not entirely clear whether the "burden of persuasion is set at a clear and convincing standard or something less stringent."  <u>Matter of Gomez v. Windows On World</u>, 23 A.D.3d 967, 969-970 (3d Dep't 2005) (comparing <u>Matter of Seidel</u>, 132 A.D.2d at 730, and <u>Matter of Esmond</u>, 26 A.D.2d at 884-885, with <u>Matter of Brown</u>, 40 N.Y.2d 938, 939 (1976), and <u>Steele v. Richardson</u>, 472 F.2d 49, 52-53 (2d Cir. 1972), and citing generally <u>Dolan v. Celebrezze</u>, 381 F.2d 231 (2d Cir. 1967)).  But, to carry the burden, the challenger is required to disprove "every reasonable possibility which would validate * * *

[*42] [the challenged] marriage." Matter of Seidel, 132 A.D.2d at 730 (citing Matter of Esmond, 26 A.D.2d 884, and 45 N.Y. Jur. 2d, Domestic Relations, secs. 77-78, at 376-379); see also Matter of Brown, 40 N.Y.2d at 939 ("[T]he presumption in favor of the validity of the second marriage is a powerful one, requiring 'strong and satisfactory' proof to the contrary from one who would attack it (Whittley v Whittley, 60 Misc. 201, 203) 'even though this might require the proof of a negative' (Apelbaum v Apelbaum, 7 AD2d 911; see, also, Matter of Dugro, 261 App Div 236, affd 287 NY 595; Boyd v Boyd, 252 NY 422)[.]").

As the challenger of the Israeli marriage, the Commissioner would have the burden to rebut the presumption, which would be "even stronger" given that he is "a total stranger to the marital relation." Matter of Seidel, 132 A.D.2d at 730. The Commissioner contends that the burden is met by the 1976 declaratory judgment issued by the Supreme Court of the State of New York finding that Semone's marriage to Hilda was not legally dissolved, that Semone's marriage to Katia was null and void, and that Semone was the lawful husband of Hilda. The declaratory judgment order provides proof of where things stood as of 1976, when Semone's marriage to Katia was declared invalid. But it provides no proof about where things stood by 1987, more than a decade later, when Semone married Ziona in Israel. Put another way, the declaratory judgment order issued in 1976 tells us

**[*43]** nothing about whether Semone and Hilda obtained a judicial divorce between 1976 and 1987. On brief, the Commissioner asserts he "conducted a search of New York state court records" that turned up no evidence of a divorce between Semone and Hilda. Even accepting that assertion as true,[26] we do not think it would be sufficient to carry the Commissioner's burden.

As then-Judge Sotomayor observed in Metropolitan Life Insurance Co. v. Jackson, 896 F. Supp. 318, 321 (S.D.N.Y. 1995), "a more extensive search of all locations where the marriage could have been dissolved is necessary to prove the negative that a dissolution of a marriage did not occur." Here, Semone's actions demonstrate that he was willing to travel outside of New York to obtain a divorce. For example, as already discussed, Semone went to Mexico to obtain a unilateral civil divorce from Hilda in 1967. Although that divorce was ultimately disregarded by New York, Semone's efforts suggest that Mexico is a "location[] where the marriage could have been dissolved," in a later year. See id. New York recognizes bilateral Mexican divorces--i.e., divorces in which at least one party to a marriage appears in person before a Mexican court and the other party appears

---

[26]As the Estate has pointed out, statements in briefs are not evidence. See Rule 143(c); see also Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992). Moreover, the Commissioner's description of his search is too vague to inform the Court of what exactly was done.

[*44] either in person or through an attorney, see Rosenstiel v. Rosenstiel, 16 N.Y.2d 64, 74 (1965)--and so one cannot preclude the possibility that Semone and Hilda dissolved their marriage through a bilateral civil divorce in Mexico or in another jurisdiction before 1987.

Moreover, the Commissioner's task of proving the negative becomes that much harder when considering that Hilda in her income tax returns for many years reported under penalties of perjury being single (not married filing separately). Having filed those returns, even Hilda likely would be precluded from challenging Semone's marriage to Ziona under New York law. The New York Court of Appeals has been clear on this point: "A party to litigation may not take a position contrary to a position taken in an income tax return[.] * * * We cannot, as a matter of policy, permit parties to assert positions in legal proceedings that are contrary to declarations made under the penalty of perjury on income tax returns." Mahoney-Buntzman v. Buntzman, 12 N.Y.3d 415, 422 (2009); see also, e.g., Ponorovskaya v. Stecklow, 45 Misc. 3d 597, 608-609 (N.Y. Sup. Ct. 2014) (applying place of celebration rule and holding that plaintiff's "tax returns must be seen as proof that neither she nor the defendant considered themselves to be legally married"). Hilda also made no statutory claim to elect against Semone's will, notwithstanding the size of the estate. And she did not otherwise challenge Semone and Ziona's

**[\*45]** marriage, although she knew how to do so. Finally, both Semone and Hilda are now dead, so their testimony on this issue is no longer available.

Significantly, Semone and Ziona's marriage resulted in two children and lasted for 27 years. These are exactly the types of facts that, according to Judge Friendly's analysis in <u>Dolan</u>, explain the cases in which New York courts have found the presumption applicable. <u>See Dolan</u>, 381 F.2d at 237-238 ("[T]he decisions that have held the subsequent marriage to be valid on the basis of the presumption are explicable in terms of effectuating a particular public policy such as upholding legitimacy \* \* \* [or] favoring the participation in the decedent's estate of one who lived with him as his spouse[.]"); <u>see also Steele</u>, 472 F.2d at 53 (applying the presumption in a case under the Social Security Act and "see[ing] little virtue in straining to hold the presumption of a valid later ceremonial marriage rebutted in order to deny a surviving spouse her claim to financial support after some period of cohabitation").

These circumstances easily distinguish this case from those in which the presumption was overcome when either the first spouse or children from the first marriage successfully maintained that the first marriage remained valid. <u>See, e.g.</u>, <u>Dolan</u>, 381 F.2d at 238 (finding that decedent's wife from his first marriage was entitled to widow's benefits where "no spouse or child of the second [marriage]

[*46] can be adversely affected"); Matter of Terry, 32 Misc. 2d 470 (N.Y. Sur. Ct. 1961) (finding that presumption was overcome in a contest between first wife and second wife for letters of administration where first wife testified that no divorce proceedings had been instituted to terminate the first marriage).

Matter of Meltzer, 85 A.D.2d 826, is instructive in considering how the presumption in favor of the second marriage is applied. There the Workers' Compensation Board awarded benefits to a decedent's second wife. The decedent's employer and its insurance carrier objected, arguing that the second wife was not the decedent's widow, as required by the relevant statute. Id. at 826. The record in the case revealed that the decedent's first wife had obtained a Mexican divorce in which the decedent did not appear. Such a divorce was invalid under New York law.[27] See Rosenbaum, 309 N.Y. at 374-375 (noting that an ex parte Mexican divorce is a "complete nullity" under New York law). Despite this record evidence, the board "found the [second] marriage to be valid and * * * [the second wife to be] the legal widow." Matter of Meltzer, 85 A.D.2d at 826. The New York Appellate Division upheld the board's decision: "There is an extremely

---

[27]Indeed, the divorce at issue in Matter of Meltzer v. McAnns Barr & Grill, 85 A.D.2d 826 (3d Dep't 1981), was the same kind as the one Semone obtained in Mexico with respect to Hilda in 1967 before marrying Katia and that the 1976 declaratory judgment issued by the Supreme Court of the State of New York found to be invalid.

**[\*47]** strong presumption of validity where there is a ceremonial marriage, and a stranger to the marital relationship has a heavy burden to establish its invalidity (Matter of Esmond v. Lyons Bar & Grill, 26 A.D.2d 884). The board could properly find on this record that the burden was not met here." Id. In short, on weaker facts than those before us, the second marriage was respected under New York law.

Based on the foregoing, in our view, even if the New York Court of Appeals did not fully resolve this case under the place of celebration rule recognized in Van Voorhis and its progeny as discussed above, see supra Part III.A, it would likely resolve the case in the Estate's favor based on the New York law presumption in favor of the second marriage.

C.     Proper Relationship Between Federal and State Courts

Our conclusion also properly takes into account the oft-expressed concern that "Congress did not intend that the Commissioner in making tax determinations around marital status, or the courts in passing upon them, should set themselves up as domestic relations tribunals." Estate of Borax v. Commissioner, 349 F.2d 666, 676 (2d Cir. 1965) (Friendly, J., dissenting); see also Lee v. Commissioner, 64 T.C. 552, 557-558 (1975), aff'd, 550 F.2d 1201 (9th Cir. 1977). The parties most keenly interested in the status of Semone and Ziona's marriage--Semone, Ziona,

[*48] and Hilda--did not challenge the marriage. Nor has any New York or other court found the marriage invalid.[28] In these circumstances, like the Second Circuit in Estate of Spalding, 537 F.2d at 669, we are "unwilling[] on this record to assume the responsibility for declaring that * * * [Semone] and * * * [Ziona] were not husband and wife in * * * [New York]."

IV.   Conclusion

The Commissioner's motion asks us to find that Semone and Hilda were never divorced for purposes of New York law, with the result that Semone and Ziona could not validly marry. But by focusing on the divorce and its validity in

---

[28]This was a critical element of our and the Second Circuit's decision in Estate of Goldwater. In that case, the Supreme Court of the State of New York (the trial court in that State) had declared that the first wife was, and at all relevant times had been, the lawful wife of the decedent and that the decedent and the purported second wife had never been husband and wife. Estate of Goldwater v. Commissioner, 64 T.C. 540, 542 (1975), aff'd, 539 F.2d 878 (2d Cir. 1976). The New York Supreme Court had also declared null and void a unilateral divorce obtained by the husband in Mexico, so that under New York law there was no valid divorce when decedent died. Id. at 547. Moreover, the first wife had filed notice to take an elective share of the decedent's estate, and that claim was settled by the estate for a considerable amount. Id. at 543. Furthermore, the estate at issue was administered by the State of New York. On these facts, the Second Circuit "consider[ed] that there is no alternative but to follow the law of New York and hold that * * * [the first wife] is * * * [decedent's] 'surviving spouse' and that * * * [the purported second wife] does not qualify as such within the meaning of section 2056." Estate of Goldwater v. Commissioner, 539 F.2d at 881. But we do not have in the case before us any ruling by a New York court concerning the validity of Semone and Ziona's Israeli marriage. Accordingly, our hand is not forced to follow a local court's ruling.

[*49] New York, the Commissioner asks the wrong question and gets the wrong answer.  By contrast, the Estate properly focuses on Semone and Ziona's marriage and asks us to conclude that it was lawful based on New York's place of celebration rule, which makes Ziona the "surviving spouse" of Semone for purposes of section 2056(a).  For the reasons described above, we agree with the Estate's approach.  We therefore will deny the Commissioner's motion for partial summary judgment and will grant the Estate's motion for partial summary judgment.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.